IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA



FILED

SEP 30 2010

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

| | | |
|---|---|---|
| BETH OLIVER, Personal Representative of the ESTATE OF MARK MENDENHALL, Deceased, | § § § § | |
| Plaintiff, | § § § | |
| vs. | § § | CASE NO. 1:10cv168 |
| MYLAN, INC., MYLAN PHARMACEUTICALS, INC., and MYLAN TECHNOLOGIES, INC., | § § § § § | JURY TRIAL DEMANDED |
| Defendants. | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Pursuant to West Virginia Code § 55-7-6, Beth Oliver ("Plaintiff"), as personal representative of the Estate of Mark Mendenhall ("Decedent"), files this Original Complaint and Jury Demand against Mylan, Inc., Mylan Pharmaceuticals, Inc., and Mylan Technologies, Inc. (collectively, the "Mylan Defendants") and for cause of action would show:

### PARTIES

1. Plaintiff Beth Oliver is an individual residing in Palm Beach County, Florida. Plaintiff is the sister of Mark Mendenhall ("Decedent") and the duly appointed personal representative of Decedent's estate (Exhibit 1). Decedent was a citizen of Florida at the time of his death; therefore, as the representative of Decedent's estate, Plaintiff is deemed to be a citizen of Florida for purposes of determining the existence of diversity jurisdiction. Under W. Va. Code § 55-7-6, Plaintiff brings this action on behalf of all of Decedent's wrongful death beneficiaries.

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND                                                                 PAGE 1

2. Defendant Mylan, Inc. is a corporation organized and existing under the laws of the State of Pennsylvania. Its principal place of business is in Pennsylvania. It has done and is doing business in West Virginia and may be served with process by serving its registered agent, Corporation Services Co., 209 West Washington Street, Charleston, West Virginia 25302.

3. Defendant Mylan Pharmaceuticals, Inc., a subsidiary of Mylan, Inc., is a corporation organized and existing under the laws of the West Virginia. Its principal place of business is in Morgantown, West Virginia. It has done and is doing business in West Virginia and may be served with process by delivering a copy of the summons and the complaint to its President, Anthony Mauro, at 781 Chestnut Ridge Road, Morgantown, WV 26505, or any other officer or managing agent at such address.

4. Defendant Mylan Technologies, Inc., a subsidiary of Mylan, Inc., is a corporation organized and existing under the laws of the State of West Virginia. Its principal place of business is in St. Albans, Vermont. It has done and is doing business in West Virginia and may be served with process by serving its registered agent, Corporation Services Co., 209 West Washington Street, Charleston, West Virginia 25302.

### JURISDICTION AND VENUE

5. Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this case because it is a lawsuit between parties of diverse citizenship and the amount in controversy exceeds $75,000. Venue is proper in this Court under 28 U.S.C. § 1391(a)(1) because (1) one or more of the Mylan Defendants reside in the Northern District of West Virginia and (2) all of the Mylan Defendants reside in the State of West Virginia. Under 28 U.S.C. § 28 U.S.C. § 1391(c), a corporation is deemed to reside in any judicial district in which it is subject to personal

jurisdiction at the time an action is commenced.

6. Mylan Pharmaceuticals has its principal place of business located in Morgantown, West Virginia and is subject to service of process in this district. Therefore, under 28 U.S.C. § 28 U.S.C. § 1391(c), Mylan Pharmaceuticals is deemed to reside in the Northern District of West Virginia.

7. Each of the Mylan Defendants is subject to personal jurisdiction in the State of West Virginia because: (1) the Mylan Defendants have done and are doing business in this state; (2) the Mylan Defendants design, manufacture, market, and distribute fentanyl patches and other pharmaceutical products in this state; (3) the Mylan Defendants have large facilities and numerous employees in West Virginia; (4) the Mylan Defendants have appointed an agent for service of process in this state and (5) Mylan Pharmaceuticals, Inc. and Mylan Technologies, Inc. are incorporated in West Virginia. Therefore, under, 28 U.S.C. § 28 U.S.C. § 1391(c), each of the Mylan Defendants is deemed to reside in the State of West Virginia.

8. The Mylan Defendants' product safety and risk management group is located in Morgantown, West Virginia.

9. The employees involved in monitoring the safety of Mylan fentanyl patches are all located in Morgantown, West Virginia.

10. The Mylan employees involved in monitoring adverse events and reporting them to the FDA are located in Morgantown, West Virginia.

11. The Mylan employees involved in evaluating deaths and adverse events associated with Mylan fentanyl patches perform the evaluations in Morgantown, West Virginia.

12. Reports to the FDA about deaths and adverse events associated with Mylan fentanyl patches are sent to the FDA from Mylan employees in Morgantown, West Virginia.

## FACTS

13. This suit arises out of the wrongful death of Decedent, due to the wrongful conduct of Defendants. Decedent, while a patient of Rui Cerejo, M.D., was given a prescription for 100 mcg fentanyl patches. The prescription was filled with 100 mcg Mylan (fentanyl transdermal system) patches from a local pharmacy. Decedent was wearing one of these patches (the "Mendenhall Patch") at the time of his death and it was the cause of his death. The Patch worn by Decedent at the time of his death was designed, manufactured, marketed, and distributed by the Mylan Defendants.

14. The Patch is a matrix patch containing the drug fentanyl. Fentanyl is an extremely dangerous drug that is at least 80 times stronger than morphine. Fentanyl is classified as a Schedule II controlled substance by the FDA and is generally used to relieve pain.

15. The Patch is applied by the patient and delivers fentanyl though the patient's skin. The Mylan Defendants design, manufacture, market and sell the Patch with the intention that it will release a certain amount of fentanyl into a patient at a certain rate, and thus produce a certain level of fentanyl in the blood of the patient. In other words, if a Patch functions as intended and it is properly used by the patient, the patient should not receive a harmful dose of fentanyl. Decedent never abused the Patch or used it inappropriately.

16. The Patch is unsafe for its intended or reasonably foreseeable use because it can and does cause lethal levels of fentanyl in patients.

17. Prior to the time Decedent's patch was manufactured and distributed, numerous patients

received lethal doses of fentanyl while using the Patch as prescribed. The Mylan Defendants knew or should have known that patients were receiving lethal fentanyl doses from proper use of the Patch because of internal studies (indicating that patients had received lethal levels of fentanyl while properly using the Patch), wrongful death lawsuits filed against them (alleging that patients had died with a lethal fentanyl blood concentration while properly using the Patch), the FDA's adverse event reporting system, and adverse event reports from medical examiners and the World Heath Organization.

18. Decedent was prescribed the Mendenhall Patch by Rui Cerejo, M.D. for pain. Decedent died on October 20, 2008. Decedent received a lethal blood concentration of fentanyl-which caused him to die of a fentanyl overdose-while using the Mendenhall Patch as prescribed. The defective condition of the Mendenhall Patch was a legal cause of Decedent's fentanyl overdose and resulting death.

## CAUSES OF ACTION

### COUNT I
### STRICT PRODUCT LIABILITY
### (against the Mylan Defendants)

19. Plaintiff incorporates herein by reference the relevant consistent allegations of the preceding paragraphs as if included herein.

20. The Mylan Defendants are liable under the theory of product liability as set forth in §§402A and 402B of the Restatement of Torts 2d. The Mylan Defendants at all times material hereto engaged in the business of designing, manufacturing, selling, marketing, and/or supplying the Patch, including the Mendenhall Patch. The Mendenhall Patch was in a defective condition at the time it was designed, manufactured, sold, and/or marketed by the Mylan

Defendants and at the time it left their possession because it was unreasonably dangerous. The Mendenhall Patch was unreasonably dangerous and, therefore, defective because, inter alia, it gave Decedent a much higher dose of fentanyl than a properly functioning patch should have given him. As discussed below, Defendants failed to warn of the Mendenhall Patch's defective condition or utilize a safer alternative design. Decedent was unaware of the defective condition of the Mendenhall Patch at the time he used the product in the manner and for the purpose it was intended. The defective condition was a legal cause of Decedent's death and the damages described herein.

21. The Mendenhall Patch was in the control of the Mylan Defendants at the time the defect occurred. Further, the injury sustained by Decedent, fentanyl intoxication, was the exact type of injury that a defective Patch causes. The Mendenhall Patch reached Decedent without any substantial change in its condition. The Mendenhall Patch presented an unreasonable risk of injury in that the risk was one which a reasonably prudent person having full knowledge of the risk would find unacceptable. Because of the nature of ingredients or natural characteristics of the Mendenhall Patch, use of it involved a substantial risk of injury. The exposure to risk of injury was unreasonable taking into consideration a balancing of the dangers and benefits resulting from the product's use.

### 1. Manufacturing Defect

22. More specifically, the Mendenhall Patch was defective because of the existence of a manufacturing flaw which rendered the product unreasonably dangerous at the time it left the Mylan Defendants' control. The Mendenhall Patch was unreasonably dangerous because it did not conform to its intended design and failed to perform as safely as the intended

design would have performed. The Mendenhall Patch was unreasonably dangerous beyond that which would be contemplated by the ordinary user. The manufacturing defect was a legal cause of Decedent's death and the damages claimed herein. Without limitation, the Mendenhall Patch was defective because it malfunctioned and did not perform as intended and designed.

### 2. Marketing Defect

23. Pleading further and without waiver of the foregoing, the Patch was defective because the Mylan Defendants failed to warn of risks that were known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time the Mendenhall Patch was manufactured and distributed. The Mylan Defendants knew or had reason to know the Patch was or was likely to be unreasonably dangerous in the use for which it was made. The danger was not open and obvious. The Mylan Defendants failed to exercise reasonable care to warn Decedent or his doctor of the dangerous condition or the facts that made it dangerous. The Mylan Defendants' failure to warn was a legal cause of Decedent's death and the damages claimed herein.

### 3. Design Defect

24. Pleading further and without waiver of the foregoing, the defective design of the Patch made it unreasonably dangerous because it (a) failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by the Mylan Defendants and/or (b) the risk of danger in the design outweighed the benefits. The Mylan Defendants were aware or had reason to know that the design of the Patch was defective and that another design was feasible. The design defect was a legal cause of Decedent's death

and the damages claimed herein.

25. For these reasons, the Defendants are strictly liable under applicable products liability law without regard to proof of negligence and gross negligence.

### COUNT II
### NEGLIGENCE
### (against the Mylan Defendants)

26. Plaintiff incorporates herein by reference the relevant consistent allegations of the preceding paragraphs as if included herein.

27. The Mylan Defendants had a duty to exercise reasonable care in the design, manufacture, marketing, testing, inspection, sale and distribution of the Mendenhall Patch into the stream of commerce, including but not limited to, a duty to assure that the Patch did not cause an unreasonable risk of harm, including death, to persons, such as Decedent, who might reasonably be expected to use the Patch.

28. The Mylan Defendants breached their duty towards Decedent when they negligently acted or failed to act in one or more of the following ways:

   a. Providing misleading, inadequate, and/or insufficient warnings regarding the Patch;

   b. Failure to use due care in designing the Patch (by failing to include a rate-control membrane or a laminated adhesive face layer, failing to use buprenorphine instead of fentanyl in the Patches, or to use another safer alternative design);

   c. Failure to use due care in manufacturing the Patch;

   d. Failure to use proper materials reasonably suited to the manufacture of the Patch;

   e. Failure to provide to the FDA information or data relevant to the safety of the Patch;

   f. Failure to obtain easily accessible information or data relevant to the safety of the

Patch;

g.  Not performing sufficient testing of the Patch to confirm or ensure that they were safe for their intended use;

h.  Failure to use due care to test and inspect the Patch to determine their durability and functionality for the purpose for which they were intended;

i.  Failure to ensure the Patch was made without defects;

j.  Failure to conduct adequate testing and post-marketing surveillance to determine the safety of the Patch;

k.  Misrepresenting that the Patch was safe for use;

l.  Inadequate or insufficient inspection for defects;

m.  Inadequate and/or insufficient research into the safety of the product prior to sale;

n.  Inadequate and/or insufficient monitoring or research regarding adverse events;

o.  Failure to list death as an adverse event;

p.  Failure to provide adequate training, knowledge, or information to physicians, distributors, or sellers of the product;

q.  Marketing the Patch for unsafe uses;

r.  Failure to adequately warn individuals of the dangerous and lethal side effects of the product;

s.  Formulating and designing the product;

t.  Making the product;

u.  Inspecting and testing the product;

v.  Packaging the product; and

    w.    Other and further particulars as will be proven at trial.

29. Decedent was one of the persons the Mylan Defendants should have reasonably expected to use the Patch. At the time of Decedent's death, Decedent was using the Mendenhall Patch as prescribed and in a manner that the Mylan Defendants should have reasonably expected.

30. The negligent, willful, and wanton conduct of the Mylan Defendants, as alleged above, was a legal cause of Decedent's death and the damages asserted herein.

### COUNT III
### NEGLIGENT MISREPRESENTATION
### (against the Mylan Defendants)

31. Plaintiff incorporates herein by reference the relevant consistent allegations of the preceding paragraphs as if included herein.

32. The Mylan Defendants directly participated in and exercised substantial control over the marketing, sale, and distribution of the Mendenhall Patch into the stream of commerce, including the representations, warnings, and instructions for the Patches.

33. The Mylan Defendants knew or should have known that the Mendenhall Patch created a high risk of unreasonable, dangerous side effects, including that proper use of the Patches can cause death because, inter alia:

    a.    Internal studies indicated that patients had received lethal levels of fentanyl (while properly using the Patch);

    b.    Families of patients who died while wearing Mylan fentanyl patches filed wrongful death lawsuits (alleging that patients had died with a lethal fentanyl blood concentration while properly using the Patch);

    c.    The Mylan Defendants received information from the FDA's adverse event reporting

        system indicating that patients had received fatal fentanyl overdoses while using the Patch as prescribed;

    d.    The Mylan Defendants received information from the World Heath Organization indicating that patients had received lethal fentanyl levels while using the Patch as prescribed; and

    e.    The Mylan Defendants received or had access to publically available autopsy reports indicating that patients had died from fentanyl overdoses with lethal blood fentanyl levels while using the Patch as prescribed; and

    f.    The Mylan Defendants received numerous reports (through the FDA's adverse event reporting system and otherwise) that they had produced numerous leaking, defective Patches (which the Mylan Defendants agree can cause fatal fentanyl overdoses) and distributed them to the public.

34.    But the Mylan Defendants failed to communicate to Decedent's doctor and others that proper use of the Patches could cause serious injury and/or death. Without limitation, the Mylan Defendants failed to provide the adequate warnings and instructions to Decedent or his doctor about the following risks:

    a.    The risk of death from the proper use of the Patch.

    b.    That death from proper use of the Patch is an adverse event;

    c.    The risk that patients would receive potentially lethal fentanyl levels-far exceeding the levels the Patch was designed to deliver-while properly using the Patch;

    d.    The risk of death from fentanyl's narrow therapeutic index;

    e.    The risk of potentially fatal fentanyl overdoses caused by defectively manufactured

    Patches;

  f. The risk of patient fentanyl overdoses and deaths caused by the use of fentanyl with other drugs; and

  g. The risks associated with the reasonably foreseeable misuse of the Patch.

35. In addition, the Mylan Defendants represented (in the prescribing information and elsewhere) that the Patches would release a certain amount of fentanyl into patients at a certain rate and would produce a certain level of fentanyl in the blood of patients using the Patch that was far lower than Decedent's fentanyl level at the time of his death.

36. The Mylan Defendants, individually, and through its agents, representatives, distributors, and/or employees, negligently misrepresented these material facts about the Patch in the course of its business because it made such misrepresentations when it knew or reasonably should have known of the falsity of such misrepresentations. Alternatively, the Mylan Defendants made such misrepresentations without exercising reasonable care to ascertain the accuracy of these representations.

37. The above misrepresentations were made to Decedent, his doctor, and others.

38. The Mylan Defendants intended to induce Decedent and his doctor, to rely on its representations.

39. Decedent and his doctor justifiably relied on the Mylan Defendants' misrepresentations.

40. As a result of the Mylan Defendants' negligent misrepresentations, Decedent used the Mendenhall Patch for Decedent, which caused Decedent's fentanyl overdose and resulting death. The Mylan Defendants' negligent misrepresentations were a legal cause of the death of Decedent and the damages claimed herein.

## COUNT IV
## BREACH OF EXPRESS WARRANTY
### (against the Mylan Defendants)

41. Plaintiff incorporates herein by reference the relevant consistent allegations of the preceding paragraphs as if included herein.

42. The Mylan Defendants made affirmations of fact or promises regarding the safety and effectiveness of the Mendenhall Patch (including the safe, time-released delivery of fentanyl), which became part of the basis of the bargain.

43. Pursuant to Florida Statute §672.313, an express warranty was formed regarding the Patch.

44. The Mylan Defendants were in privity with Decedent because, inter alia, it informed patients, including Decedent, and physicians, including Decedent's doctor, that doctors could assure patients such as Decedent that Mylan Patch would provide fentanyl in a safe, time released manner and would produce fentanyl blood levels consistent with the pharmacokinetics information in the package insert.

45. The Mylan Defendants' breach of their affirmations of fact or promise regarding the Mendenhall Patch was a legal cause of the Decedent's death and the damages claimed herein.

## DAMAGES

46. **Punitive, Exemplary, and Other Damages.** The conduct of the Mylan Defendants constituted a conscious and intentional disregard for and indifference to the rights and safety of Decedent, which Defendants knew was reasonably likely to result in injury, damage, or harm to Decedent. The Mylan Defendants' conscious and intentional disregard for and indifference to the rights and safety of Decedent was related to Decedent's death.

Alternatively, the conduct of the Mylan Defendants was committed wantonly, wilfully, recklessly, with criminal indifference to the civil obligations affecting the rights of others, or constituted extremely negligent conduct that was likely to cause serious harm. Plaintiff therefore seeks recovery of punitive, exemplary and any other additional damages that the law allows under the causes of action asserted above.

47. **Actual Damages**. The unlawful acts and practices described above are and were a producing and proximate cause of Decedent's injuries and eventual death. Plaintiff seeks all damages available under West Virginia law (or any other applicable law), including, without limitation: (1) sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices and advice of the Decedent; (2) compensation for reasonably expected loss of (a) income of Decedent and (b) services, protection, care and assistance provided by Decedent; (3) expenses for the care, treatment and hospitalization of Decedent incident to the injury resulting in death; and (4) reasonable funeral expenses.

## CONDITIONS PRECEDENT

48. All conditions precedent to Plaintiff's right to recover the relief sought herein have occurred or have been performed.

## DEMAND FOR JURY TRIAL

49. Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands trial by jury on all issues.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that the Mylan Defendants be cited to appear and answer, and that the Court set the case for jury trial, and that judgment be

entered against the Mylan Defendants, jointly and severally, for the damages set forth herein above; for pre-judgment and post-judgment interest and costs of suit; and for such other and further relief to which Plaintiff may be justly entitled.

        BETH OLIVER, Personal Representative of the ESTATE OF MARK MENDENHALL, Deceased, Plaintiff,

        By Counsel:

        _____
        Kathryn Reed Bayless
        WV State Bar No.: 0272
        **Bayless Law Firm PLLC**
        1607 W. Main St.
        Princeton WV 24740
        304-487-8707 (voice)
        304-487-8705 (fax)
        kay@baylesslawfirm.com

Of Counsel:

James Craig Orr, Jr.
jim@hop-law.com
Texas Bar No. 15313550
Michael E. Heygood
michael@hop-law.com
Texas Bar No. 00784267
Eric D. Pearson
eric@hop-law.com
Texas Bar No. 15690472
Charles W. Miller
charles@hop-law.com
Texas Bar No. 24007677
**Heygood, Orr & Pearson**
2331 W. Northwest Highway, 2nd Floor
Dallas, TX 75220
214-237-9001 (office)
214-237-9002 (fax)